IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.  3:19-CR-19-MHL |
| | ) | |
| TROY GEORGE SKINNER, | ) | **FILED UNDER SEAL**[1] |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNITED STATES RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS COUNTS ONE THROUGH NINE ON
FIRST AMENDMENT GROUNDS**

The United States of America, by and through its attorneys, G. Zachary Terwilliger, United States Attorney for the Eastern District of Virginia, and Brian R. Hood, and Katherine Martin, Assistant United States Attorneys, hereby responds in opposition to Defendant's Motion to Dismiss Counts One through Nine On First Amendment Grounds (ECF No. 71).  For the reasons that follow, the defendant's motion should be denied.

I.    FACTUAL BACKGROUND

In December 2017, the defendant, TROY GEORGE SKINNER,

---

[1] Because the government's responsive pleadings to defendant's pretrial motions contain extensive references to facts which fall under the ambit of 18 U.S.C. §§ 3509(d)(1)(A) and 3509(d)(2), and consistent with the Court's Protective Order (ECF No. 4), the government's responses have been filed under seal.







On June 20, 2018, SKINNER departed from Auckland, New Zealand, via Qantas Airlines, arriving in Sydney, Australia.  On the same day, SKINNER departed from Sydney, Australia, via American Airlines, arriving in Los Angeles, California.  SKINNER's travel on June 20 continued as he departed from Los Angeles, California, via American Airlines, arriving the next day on June 21, 2018, at Washington Dulles Airport in Dulles, Virginia.  On June 21, 2018, SKINNER took the Greyhound Bus from Washington, D.C., to Richmond, Virginia.  SKINNER spent the night of June 21, 2018, at the Hostelling International located at 7 North 2nd Street, Richmond, Virginia.

On June 22, 2018, SKINNER traveled to the Walmart Supercenter (hereafter "Walmart"), located at 11400 West Broad Street Road, Glen Allen, Virginia.  While at Walmart, SKINNER made two purchases.  SKINNER first purchased pepper spray.  In a separate transaction, SKINNER purchased a clip knife and duct tape.

Later on the afternoon of June 22, 2018, SKINNER arrived at V1's residence in Goochland, Virginia. V1 had previously given SKINNER her actual home address during one of their online chat sessions. Footprints on the ground that matched the tread on SKINNER's shoes indicate that SKINNER did not walk up the driveway to V1's house but rather approached the residence from nearby woods.

SKINNER attempted to gain entrance to the residence through a basement sliding glass door. Speaking through the glass door, SKINNER asked V1's mother for help. V1's mother told SKINNER to go away or she would call the police. SKINNER responded, "You're not going to help me?" or words to that effect, and the mother repeated her warning. At that point, SKINNER picked up a hard object and began to beat on the glass of the basement sliding glass door. Unsurprisingly, SKINNER's actions alarmed V1, her sister and her mother, so they ran upstairs out of the basement and locked the door at the top of the steps. Family members telephoned V1's father, who in turn called 911. V1's father also instructed the mother to get the family pistol, which was in the house for protection. At one point, V1's mother called out to SKINNER from inside the house and demanded that he leave, told him that the police were on their way, and further told him that she had a gun.

The defendant eventually went up the stairs connected to an outside deck that was located over the basement sliding glass door through which he first attempted to force his way into the residence. The entrance to the house from the deck was a wooden door that had a large glass panel. While on the deck, SKINNER took a large gardening stone and smashed the glass panel to this door. He then reached his upper body into the opening created by the smashed glass. As SKINNER's hand flailed about in an effort to reach the interior doorknob, V1's mother screamed repeatedly that the police were on the way, and that she had a gun and would shoot him. When

6

SKINNER persisted in reaching for the doorknob, V1's mother fired her handgun twice, hitting SKINNER once in the neck.

Law enforcement officers with the Goochland County Sheriff's Office (GCSO) arrived on the scene shortly thereafter and found SKINNER covered in blood and lying in a neighbor's yard. A GCSO deputy sheriff asked SKINNER what happened. SKINNER told the deputy that he had been shot while trying to break the window to the door. When the deputy asked further why was trying to break the window, SKINNER said so that he could get to his girlfriend, or words to that effect.

In near proximity to SKINNER as he was lying on the ground was a sweatshirt, which investigators later connected to SKINNER. Underneath the sweatshirt was a knife, which was open and in an extended position. Officers also found a backpack nearby SKINNER, which they connected to him. A search of the backpack revealed a roll of duct tape. Investigators also recovered from SKINNER a small canister of pepper spray, as well as a hand-written checklist of items to bring, which included pepper spray and duct tape. GCSO officers also seized two cell phones from him, *i.e.,* a Huawei ALE-L02 P8 Lite and a Samsung GT-I9300 Galaxy S III.

████████████████████████████████████████████████████████████

████████████████████████████████████████ Evidence obtained from those devices and Google accounts revealed several child pornography images, discussed at greater length below, which the defendant produced using V1 over the period of approximately February 3, 2018, to March 5, 2018.

On February 6, 2019, a grand jury returned a four-count indictment against the defendant, charging him with production of child pornography based on the initial evidence, discussed above, that investigators discovered on SKINNER's two mobile phones and in his online accounts

██████████████████████████ and ██████████████████ In the months following the indictment, the prosecution team worked with officials in the Department of Justice's Office of International Affairs and authorities in New Zealand to explore the possibility of obtaining relevant overseas evidence related to the SKINNER case.  On September 3, 2019, the Richmond FBI Division received a USB thumb drive containing 120 video and 56 image files that authorities in New Zealand had obtained via a forensic triage review[2] of a laptop computer seized from SKINNER's apartment in New Zealand. ██████████████████████████████████

██████████████████

The evidence provided by New Zealand authorities provided context for the case that was eye opening; indeed, even stunning.  As it turns out, ██████████████████████████████████



[2] This collection of images and videos does not represent the entirety of all categories of pertinent evidence recovered from digital devices seized from the defendant's residence, but rather a significant sampling of video and image files taken from SKINNER's laptop.  Forensic analysis indicates that most of the files were recorded on SKINNER's desktop computer, though at the time of this writing the government does not possess any evidence that New Zealand investigators directly recovered from the desktop machine itself.

8


Based on this new evidence, on September 18, 2019, a grand jury returned a superseding indictment against the defendant, charging him in Counts One through Nine with production of child pornography, in violation of 18 U.S.C. § 2251(a).  Count Ten alleged that the defendant committed kidnapping and attempted kidnapping of a minor, in violation of 18 U.S.C. §§ 1201(a)(1), (d) and (g).  Count Eleven charged him with kidnapping and attempted kidnapping, in violation of 18 U.S.C. §§ 1201(a)(1) and (d).  The production of child pornography counts are described in greater detail below.

Counts One through Six are based on the evidence received from New Zealand authorities. The six videos, which were created over the period of January 13 to January 25, 2018, share many characteristics. ████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Counts Seven, Eight and Nine make the same allegations as Counts Two, Three and Four, respectively, in the original indictment.  Investigators recovered the video for Count Seven, which SKINNER made on or about February 5-6, 2018, from SKINNER's Huawei cell phone.  Forensic analysis revealed that the movie was downloaded to the phone from SKINNER's ████████████████ account.  That video, which lasts 6:00 minutes, depicts essentially the same conduct as described above.

Count Eight relates to an image that investigators recovered from both SKINNER's

Samsung phone as well as his ▮▮▮▮▮▮▮▮▮▮ account.  EXIF data[3] related to the image

indicate that the photo was created on February 22-23, 2018, using SKINNER's Samsung phone.

Finally, Count Nine is a video file investigators recovered from SKINNER's

▮▮▮▮▮▮▮▮▮▮ account pursuant to a federal search warrant. ▮▮▮▮▮▮▮

## II.   LEGAL ARGUMENT

### A.   The Fact that a Child Victim Was Not Coerced Into Producing Child Pornography Does Not Remove the Offense from the *Ferber* Rule or Create Unprecedented First Amendment Protections

In *New York v. Ferber*, 458 U.S. 747 (1982), the Supreme Court held that child

pornography does not enjoy First Amendment protection.  SKINNER lists five considerations the

Supreme Court weighted in reaching its holding that material containing child pornography enjoy

---

[3] EXIF is short for "Exchangeable Image File Format," which is metadata relating to the image.  When digital cameras take pictures, often the camera will save EXIF data about the photo, including information about the make and model of the camera itself, the date and time the photo was taken, and other information such as aperture size, exposure length, and if the camera is so equipped, geographical location information.

no constitutional protections. One of those factors, which he picks up later in his brief, is "that the distribution of such materials 'is intrinsically related to the sexual abuse of children' because their distribution exacerbates the harm of the initial abuse, and because prosecution of distributors was a necessary part of the scheme to control 'the sexual exploitation of children.'" Motion at 9 (citing *Ferber*, 458 U.S. at 759).

SKINNER continues the thread with a discussion of *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), which he describes, a bit misleadingly, as having "clarified the limits of *Ferber*." Motion at 9. Importantly, *Free Speech Coalition* in no way limited *Ferber's* unqualified rejection of constitutional protections for actual child pornography. Quite so, the Supreme Court observed that "[t]he freedom of speech has its limits; it does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children." *Id*. at 245-46. Rather, at issue in *Free Speech Coalition* was the constitutionality of the Child Pornography Prevention Act of 1996 (CPPA), which extended the federal prohibition against child pornography to sexually explicit images that appear to depict minors but were produced without using any real children. The *Free Speech Coalition* Court concluded that the statute did violate the First Amendment. Distinguishing *Ferber*, the Supreme Court noted, "*Ferber's* judgment about child pornography was based upon how it was made, not on what it communicated." Motion at 9 (citing *Free Speech Coalition*, 535 U.S. at 251).

For SKINNER, the phrase "how the materials were made" expands like a shock wave following an explosion that wipes out everything in its path. From this small hook the defendant writes in his Motion on Page 9:

> [M]aterials voluntarily created by a minor him- or herself do not implicate the concern with "exploitation" and "abuse" identified by the *Ferber* Court. A minor who is at home, and who voluntarily initiates an exchange of sexually explicit material with an individual literally on the other side of the planet cannot implicate

12

the concerns with coercion and exploitation that were the basis of the decision in *Ferber*.

This is simply false.  A child under the legal age of consent cannot, as a legal matter, voluntarily engage in conduct amounting to the production of child pornography.  A defendant need not be charged with coercion and enticement, in violation of 18 U.S.C. § 2422(b), to also be properly found guilty of a § 2251(a) offense.  The notion that laws involving ages of consent exist to protect children from their own harmful instincts is one that is rife through statutory and common law.  An excellent summary of the rationale for such laws protecting children from themselves is contained in the Eleventh Circuit's *Ruggiero* case, which held that the absence of an affirmative mistake-of-age defense for charges of production of child pornography does not amount to a Fifth Amendment due process violation:

> [N]ot only is the [government's] interest in banning the sexual exploitation of children very strong, but the mistake-of-age defense is directly contrary to that interest.... [T]he defense will typically be proved by evidence that the minor was a willing, perhaps deceitful participant in producing pornographic films and photos. The [government] may legitimately protect children from self-destructive decisions reflecting the youthful poor judgment that makes them, in the eyes of the law, beneath the age of consent. One can argue that sexually sophisticated [adolescents] do not need or even do not deserve such protection, but that is a legislative question.

*United States v. Ruggiero*, 791 F.3d 1281, 1288 (11th Cir. 2015) (*quoting Gilmour v. Rogerson*, 117 F.3d 368, 372 (8th Cir. 1997)).

These very strong societal concerns for the wellbeing of children do not get changed or mitigated because the defendant's relationship with a child victim occurred strictly online.  If anything, the fact that human communications and relationships generally—among adults and children both—are increasingly of an online nature, coupled with what is indisputably a great many instances of online predation of children, these concerns apply even more to the online realm.  As

13

one district court noted in rejecting a defendant's Fifth Amendment's due process claim that the

strictly online nature of his relationship with a 13-year-old mandated a mistake-of-age defense:

> [The defendant's] unique circumstance—that he confronted his victim only online—
> does not set him meaningfully apart from [other in-person] cases, and does not
> confer upon him a fundamental right to be free from the burden of verifying his
> victim's age.

*United States v. Tollefson*, No. 18-CR-43-JPS, 2019 WL 644831, at *10 (E.D. WI February

15, 2019).  For all of these reasons, then, it is apparent that SKINNER's contention that his

online relationship removes his case from the reasoning and holding of *Ferber* lacks merit,

and his motion on this ground should be denied.

### B.      A Reasonable Mistake of Age Instruction is Neither Legally Available Nor Factually Supportable

For several reasons the defendant's alternative request for a reasonable mistake of age

instruction is utterly unwarranted.  As a legal matter, virtually every circuit to consider the question

of whether § 2251(a) is overbroad under the First Amendment because it does not include a

mistake-of-age defense has rejected that argument.  *See, e.g.*, *United States v. Henry*, 827 F.3d 16

(1st Cir. 2016); *United States v. Malloy*, 568 F.3d 166, 171, 176 (4th Cir. 2009), *United States v.*

*Humphrey*, 608 F.3d 955 (6th Cir. 2010).

Moreover, a point that should not be overlooked is that, even if a reasonable mistake-of-age

defense were available, the facts of this case would not remotely support a jury instruction to that

effect.  As a general proposition, a defendant is entitled to an instruction as to any recognized

defense for which there exists evidence sufficient for a reasonable jury to find in his favor.

*Mathews v. United States*, 485 U.S. 58, 63 (1988)).  Even so, a defendant bears the burden of

producing sufficient evidence that would support an affirmative defense instruction, and district

courts have broad discretion to deny a requested jury instruction for an affirmative defense not

supported by the facts.  *See, e.g., United States v. Hsu*, 364 F.3d 192, 198-99 (4th Cir. 2004) (*citing Mathews v. United States*, 485 U.S. at 62 and affirming the district court's denial of an entrapment instruction).

Even a cursory inspection of SKINNER's online relationship with V1 quickly dispels any question that he could have been reasonably mistaken regarding her minority status.  From almost the very beginning of their communications, V1 told SKINNER she was a minor.

SKINNER regularly saw her youthful face during online video chats.  In short, there is not a scintilla of evidence that would permit a reasonable jury to conclude that the defendant was reasonably mistaken regarding the fact that she was less than 18 years old.

### III.   CONCLUSION

For all of the above reasons, the United States requests that the Court deny defendant's

motion.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By:   _/s/_ _Brian R. Hood_____
Brian R. Hood
Katherine Lee Martin
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, VA 23219
Telephone: (804) 819-5400
Email: brian.hood@usdoj.gov
Email. katherine.martin@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on **January 24, 2020**, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to the following:


Robert J. Wagner
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0808
Robert_wagner@fd.org


Laura Koenig
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
laura koenig@fd.org


Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By:    _/s/  Brian R. Hood_____
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, VA 23219
Telephone: (804) 819-5400
Email: brian.hood@usdoj.gov

17