IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.        ) | Criminal No. 3:19cr19 (MHL) |
| ) | |
| TROY SKINNER,    ) | |
| ) | |
| *Defendant*.    ) | |

### Defendant's Objections to Presentence Report, Request for Downward Variance, and Position on Sentencing

Troy Skinner, through counsel, files his objections to the presentence report and his position with regard to sentencing pursuant to Rule 32 of the Federal Rules of Criminal Procedure. If his objections are rejected by the Court, he also asks that the Court impose a variance sentence. Mr. Skinner has received and reviewed the presentence report ("PSR") with the assistance of counsel. He has no additional amendments or corrections to the PSR and notes his objections below. Mr. Skinner comes before the Court as a result of his conviction for one count of production of child pornography, in violation of 18 U.S.C. §2251(a), after he pled guilty to that charge pursuant to a conditional plea agreement. The advisory sentencing guideline range for this offense has been determined by the probation officer to be 235 to 293 months of imprisonment, with a mandatory minimum sentence of 180 months. For the reasons discussed below, Mr. Skinner requests that this Court impose a sentence of 180 months and a term of supervised release to follow.[1]

---

[1] Since Mr. Skinner will be deported to New Zealand upon his release from federal custody, it is unlikely that he will ever serve a period of supervised release.

1

Mr. Skinner submits that under the unique facts and circumstances of this case, and the significant mitigating circumstances regarding Mr. Skinner's history and characteristics, a sentence of 180 months of incarceration is fair and reasonable in this case. This requested disposition is below the low end of the sentencing guidelines;[2] however, it is more than sufficient punishment considering all of the sentencing factors. These factors include Mr. Skinner's offense conduct, which involved online communications from across the globe, and did not entail any actual contact between Mr. Skinner and the minor. Additionally, there was no intent on Mr. Skinner's part to exploit a child because he reasonably believed she was of the age of consent in New Zealand. Further, he was not planning to hurt anyone but himself when he came to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ three and a half years ago.

He comes to this Court with no history of any criminal charges or convictions and has proven to be a model inmate at Northern Neck Reginal Jail during his three years of incarceration there. *See* attached Ex. B, Letter from Ted Hull. As reflected in the psychological report (*see* Ex. A) and the presentence report, Mr. Skinner has had a very difficult upbringing and suffers from significant mental health problems. He also has excellent support in his community in New Zealand (*see* attached Exhibit C, letter from James Stirling), where he will be deported upon release; he will pose no danger to the people of the United States when he completes his sentence. Both while serving his sentence and once returned to New Zealand, he plans to continue bettering himself and the lives of those around him.

---

[2] If the Court grants Mr. Skinner's objection, the 180-month requested sentence will be above the guidelines, at the statutory mandatory minimum sentence.

1. **Factual Background**

Troy Skinner's case is different. Unlike many child pornography and enticement cases before this Court, Mr. Skinner did not go to a place, virtual or otherwise, where he sought out the companionship of a minor for the purpose of engaging in sexual activity. He did not prey on a minor already within his sphere of influence or of persons he knew well. He was on a gaming site where almost all the people were adults. He has no history of sexual interest in minors and he has had very limited experience with any romantic relationships. He had a tortured and tragic childhood which resulted in serious mental health consequences. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ In New Zealand, 16 is the age of consent. As the relationship progressed, Mr. Skinner fell deeply in love for the first time in his life ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. His issues with attachment probably resulted in Mr. Skinner placing too much emotional capital into the relationship with R.D. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Mr. Skinner did not believe he was doing anything illegal.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. This was devastating to him for several reasons. First, this was the end of Mr. Skinner's only serious romantic relationship he had experienced, and he felt deeply in love with her. Second, Mr. Skinner had suffered abandonment from his mother when he was a child. This abandonment by his mother left very deep scars that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. And third, he suffered from significant

mental health concerns. ███████████████████████████████

███████████████████████████████████████████████████████.

Although he was confused and tormented, he meant no harm to R.D. or her family. Once he was denied entry to R.D.'s house, his thoughts of killing himself came full circle. Confronted with R.D.'s mother pointing a gun at him only several feet away, and threatening to kill him several times, he did not turn and run. He stood there and allowed her to shoot him from close range. Only moments later, when confronted by Goochland County Sheriff officers while lying on the ground after having been shot in the neck, he exclaimed, "just go ahead and shoot me, just shoot me."

Rather than waste away while incarcerated in Virginia for the next three years, Mr. Skinner chose to work on improving himself and those around him. He obtained his GED, earning some of the highest scores that Northern Neck Regional Jail had seen on the GED exam. He became a trustee and a respected worker at the jail's kitchen. *See* Ex. B, Ted Hull letter. He developed a workout program for himself and other inmates. He developed relationships with inmates to work on improving himself, and also to help others, as documented in the letters provided. Mr. Skinner has become a far healthier and productive person over the time between his offense conduct and the sentencing in this case.

In consideration of the overall picture presented, a sentence at the mandatory minimum of 180 months is more than sufficient to address all of the sentencing factors.

### 2. Objection to "Repeat and Dangerous Sex Offender" Enhancement

Mr. Skinner objects to the five-level enhancement under USSG § 4B1.5(b) for being a "repeat and dangerous sex offender," as set forth in the presentence report at paragraph 57. With the enhancement, Mr. Skinner faces an offense level of 38, CHC I, and a guideline range of 235-293 months. Without the enhancement, his guidelines are 135-168 months, a one hundred month difference at the low end. The standard for the "repeat and dangerous sex offender" enhancement envisioned under this guideline has not been met by the government. The government has failed to demonstrate that Mr. Skinner is properly characterized under this enhancement provision and qualifies for this five-level increase.

The very name and nature of the enhancement, "repeat and dangerous sex offender," is entirely inconsistent with the facts and circumstances of this case, as well as the history and characteristics Mr. Skinner brings to this Court. Because the enhancement is intended to provide longer sentences to those offenders who have a high likelihood of reoffending based on their history and conduct, this enhancement should be reserved for those individuals who demonstrate such tendencies. Mr. Skinner is not that person. Consequently, even if the Court finds that the enhancement technically applies, Mr. Skinner asks that the Court impose a variance sentence that does not include this enhancement.

The government has failed to present any evidence that Mr. Skinner exploited or attempted to exploit any children, outside of the facts of this case. This flies in the face of a designation for Mr. Skinner as a "repeat and dangerous sex offender." He loved R.D. He believed that she was of the age of consent. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. The facts underlying this enhancement, and Mr. Skinner's conduct before and after the offense, do not reasonably or fairly represent someone who should be considered to be a continuing danger or threat to the community as a sex offender. It

certainly does not justify a five-level enhancement in his guidelines, or a low-end guideline range that jumps from 135 months to 235 months.

The enhancement under USSG § 4B1.5(b) specifically provides that,

> (b) In any case in which the defendant's instant offense of conviction is a covered sex crime, neither §4B1.1 nor subsection (a) of this guideline applies, and the defendant engaged in a pattern of activity involving prohibited sexual conduct:
>
> (1) The offense level shall be 5 plus the offense level determined under Chapters Two and Three. However, if the resulting offense level is less than level 22, the offense level shall be level 22, decreased by the number of levels corresponding to any applicable adjustment from §3E1.1.

The Fourth Circuit characterizes this enhancement as follows:

> § 4B1.5(b) (1) is located in Chapter Four of the Guidelines under the provisions covering "Career Offenders and Criminal Livelihood." This placement is explained by the background commentary, which states that § 4B1.5(b) (1) "applies to offenders ... who present a continuing danger to the public," and is derived from congressional directives "to ensure lengthy incarceration for offenders who engage in a pattern of activity involving the sexual abuse or exploitation of minors." § 4B1.5(b) (1) cmt. background. That is to say, § 4B1.5(b) (1) aims not merely to punish a defendant for the specific characteristics of the offenses of conviction, as does § 2G2.2(b)(5), but to allow a district court to impose an enhanced period of incarceration because the defendant presents a continuing danger to the public.

*United States v. Dowell*, 771 F.3d 162, 171 (4th Cir. 2014).[3] Mr. Skinner does not fit this characterization of a sex offender as presented under this guideline and *Dowell*; he does not present a "continuing danger to the public."

The sentencing objective that this enhancement is intended to address is protecting the public. Based on the criminal activity in this case and Mr. Skinner's history, which is devoid of

---

[3] *See also United States v. Carter*, 292 Fed. App'x. 16, 20 (11th Cir. 2008) (unpublished) (this enhancement "looks at the likelihood that the defendant will become a repeat offender and whether lengthy incarceration is therefore needed to protect the public.").

any suggestion that he is a child sex offender or a sexual predator, Mr. Skinner does not fit this model. He will not find himself in this kind of situation again; he has learned a very painful lesson through this experience. Additionally, since he will be deported to New Zealand upon the completion of his sentence, he will not even have the opportunity to present a danger to any person in the United States. *See United States v. Taylor*, 814 F. App'x 727 (4th Cir. 2020).[4]

Further, the imposition of this sentencing enhancement in this case is not at all intuitive. The probation officer, in his original presentence report, found an offense level of 33, guideline range of 135 to 168 months, and did not include this enhancement. Mr. Skinner's situation does not stand out as one that would suggest that he is either a "repeat" or "dangerous" sex offender. Although the enhancement may technically apply, Mr. Skinner does not fit the contours of the enhancement as intended; it is designed to capture sex offense career offenders who were not otherwise captured under USSG § 4B1.1, the traditional career offender guideline generally, or §4B1.5(a), the traditional career offender provision for sex offenders. The seriousness of Mr. Skinner's criminal history (or lack thereof), and the extremely low likelihood that he will reoffend are simply not concerns sufficient to raise his offense level by 5 levels, and the low end of his guidelines by 100 months. The fair and reasonable thing to do is to sentence Mr. Skinner to 180 months of imprisonment.

The Court should also consider a variance sentence on the basis of the two-level enhancement under USSG § 2G2.1(b)(1)(B). ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

[4] In *Taylor*, the Fourth Circuit, in remanding Mr. Taylor's First Step Act to the district court noted that, "the district court also failed to address the impact of Taylor's pending order of removal to Jamaica, namely, whether he would still be a threat to the public." *Id*. at 732.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ This Court should vary from a sentence that includes this enhancement.

### 3. Sentencing Factors under 18 U.S.C. § 3553(a)

After considering the appropriately-calculated advisory guideline range, this Court is to consider all the factors under 18 U.S.C. § 3553(a) in reaching the appropriate, individualized sentence for Mr. Skinner. *See Gall v. United States*, 552 U.S. 38, 49 (2007); *Kimbrough v. United States*, 552 U.S. 58, 90 (2007).

Those factors that this Court is to consider include the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with appropriate correctional treatment, *id.* at § 3553(a)(2); the kinds of sentences available, *id.* at 3553(a)(3); the need to avoid unwarranted disparity among defendants with similar records and conduct, *id.* at § 3553(a)(6); and the need to provide any restitution to any victims of the offense, *id.* at § 3553(a)(7). Pursuant to 18 U.S.C. § 3553(a), courts must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

In assessing the § 3553(a) factors, this Court should appreciate that this is not a typical child pornography production offense. ███████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ there were no other images of child pornography found on Mr. Skinner's phone or any of the devices that were seized

from Mr. Skinner. There was no evidence that Mr. Skinner was in any way involved with the exploitation of a minor, or was a child sexual predator.

In February 2013, the United States Sentencing Commission released a report to Congress on the child pornography guidelines.[5] In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct." *Id.* at 84. Some offenders "acquire enormous and often well-organized collections," sometimes up to hundreds of thousands of images; some "intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers," *id.* at viii, 84-92; and some have collected material over "a series of decades" beginning in the pre-Internet era. *Id.* at 80. The variety of images readily available on the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality." *Id.* at 80-81, 90-91. Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer networks, like U-Torrent, to receive or distribute material "in an indiscriminate manner," while others "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." *Id.* at viii, 61-62.

---

[5] *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"] (available at h*ttp://www.ussc.gov/Legislative_and_ Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_ Child_Pornography_Offenses/*).

As this Court knows, these are the typical child pornography cases that federal courts encounter. None of these attributes apply to Mr. Skinner's case. The attached report from Dr. Nelson and the attached letters of support reflect on the struggles Mr. Skinner has endured in his life and provide additional justification for a sentence at the mandatory minimum.

### A.   Dr. Nelson's Report

Dr. Nelson's report provides the Court with a very comprehensive perspective on Mr. Skinner's conduct in this case and his mental health condition. The report chronicles the very difficult upbringing Mr. Skinner encountered, his mental health diagnosis, and the history of his mental health treatment and condition leading up to the offense.

In Dr. Nelson's report, she explains how, not only was Mr. Skinner abandoned by his mother at a very early age, but she was horribly abusive to him. Nelson Report at 7. She abused him physically and emotionally. *Id.* at 6, 16. When Mr. Skinner came home from school, his mother "would frequently beat him." She would "use her fists or something she could get . . . She was just mean." *Id.* at 6. She would also berate him by telling him that she hated him and that "he was a mistake because he was conceived when father raped" his mother. *Id.* After Mr. Skinner's mother left him when he was 12 years old, he never saw her again. He was sent to live with his father, who he had only seen once or twice before. *Id.* at 7. Although his father was not physically abusive, he was really never present in his life and was emotionally distant; he "did not pay much attention to him." *Id.* at 7, 16. Mr. Skinner said he stayed with his father on and off until he reached the age of sixteen or seventeen, and then moved out on his own.

Although Mr. Skinner reports that he had mental health concerns for a long time, he did not receive an assessment or any treatment until 2016, when he was 23 years old. Nelson Report at 3. At that time, he began seeing a series of therapists, many of whom he appeared to treat as mother figures. In 2018, Mr. Skinner was diagnosed with dependent personality disorder and

posttraumatic stress disorder, and was reported to have "clear attachment issues." *Id*. at 12. Dr. Nelson noted that "[i]ndividuals with Avoidant Personality Disorder traits have chronically anxious thinking, are overly sensitive to rejection, and feel chronically inadequate." *Id*. at 17. In 2017, Mr. Skinner was described as having social phobic symptoms and "emerging patterns of underlying emotional instability associated with passive suicidal thoughts." *Id*. at 13. It was noted that he had "chronic suicidal ideation." *Id*. at 12. In May of 2017, he was diagnosed with chronic dysthymia, social phobia, and borderline, avoidant, and dependent traits. He was also described as having "unresolved grief related to abandonment by his parents." *Id*. at 12. Mr. Skinner's records reflected that he was experiencing "chronic suicidal ideation." *Id*. at 12. There were also references in his treatment notes to "symptoms of depression, panic disorder with agoraphobia, and social anxiety disorder." *Id*. at 11.

According to his treatment records, he seemed to have a mental health breakthrough in January of 2018 when he reported to his mental health service providers that he had forged a relationship with R.D. This relationship "motivated him positively to make behavioral changes." *Id*. at 13. It was reported that "he immediately accomplished significant goals." He got a driver's license, got his name legally changed, applied for and was accepted to a local university, and bought his first car. *Id*. at 13, 18-19. He began exercising, taking better care of himself, and drinking less alcohol. *Id*. ███████████████████████████████████████, everything fell apart. The breakup "triggered a lot of his early life trauma of abandonment" and was extremely painful. *Id*. at 13. He was described as being at a high risk of doing harm to himself. One of his long-term therapists noted after the breakup that Mr. Skinner was "in such an impaired emotional state that he became suicidal, making an attempt on his life and after disclosing this to his community support worker, the police and the crisis team were called." *Id*. at 12.

Mr. Skinner confided in Dr. Nelson his thought process in traveling to the United States and coming to R.D.'s home. She writes that Mr. Skinner "readily acknowledged that it was a poorly thought out plan, but at the time he believed he would either show up, declare his love, reunite with the love of his life, and live happily ever after or he would die; in keeping with his longstanding passive suicidal ideation, he assumed (correctly) that because her family had guns, someone might shoot him. Consistent with his dependent personality pathology, he had become convinced that he would be unable to live without [R.D.] . . . ." *Id*. at 19. Dr. Nelson comments about how Mr. Skinner set up a very dramatic encounter "where he loved and lived or was rejected and died, thus illustrating the dependent/avoidant dynamic that has plagued him throughout at least his adult life." *Id*.

Dr. Nelson concluded her report by commenting that "Mr. Skinner appears to be gaining some insight into his personality dynamics and he has done well with the structure of employment at the jail. This has allowed him to develop new relationships and self-esteem." *Id*. at 18. Dr. Nelson believes that Mr. Skinner can continue improving his mental health by participating in "intensive psychotherapy to address his personality dynamics" and potentially being administered psychotropic medications for symptom relief. *Id*. at 20.

### B. Letters to the Court

In support of this sentencing position, Mr. Skinner has provided this Court with a series of letters in support of a variance sentence. A friend from New Zealand provided a letter describing his experiences with Mr. Skinner for the more than fifteen years that he has known him. *See* attached Exhibit C. Mr. Stirling explains that he has spent a considerable amount of time with Mr. Skinner, and even lived with him for some time. He speaks of the character of his friend and how "Troy is someone who will make an effort to help the people he knows." He has never seen Mr. Skinner engage in any acts of violence and Mr. Stirling has never known his friend to demonstrate

any "interest in women that would have been considered underage." Ex. C. In recent conversations with Mr. Skinner, Mr. Stirling notes that Mr. Skinner has "struck notes of remorse and humility" regarding his criminal charges.

Mr. Skinner was involved with creating music and was working with a friend in Portland, Oregon to produce music. Mr. Hartinov's letter, attached as Exhibit D, describes Troy as "quite the visionary" with his music. As described in the letter, Mr. Skinner spoke to Mr. Hartinov about coming to see him when he traveled from New Zealand to the United States in June of 2018. On page 2 of the letter, Mr. Hartinov describes that Mr. Skinner suggested in text and phone conversations that they take a road trip across the country to Virginia when he came from New Zealand to the United States. When Mr. Hartinov indicated to Mr. Skinner that they should just stay in Portland and visit Seattle, he speculated that this is when Mr. Skinner decided to go on to Virginia without him. Mr. Hartinov expresses in his letter the second guessing he has gone through regarding the decision not to accompany his musical collaborator on his trip to Virginia. Had he gone, this whole episode may have ended very differently.

While at the Northern Neck Regional Jail, Mr. Skinner developed relationships with some of his fellow inmates. One former inmate wrote about his experience getting to know Mr. Skinner in his letter attached as Exhibit E. His letter describes the very positive character attributes that Mr. Hall saw in Mr. Skinner. He speaks of his "generosity," his intelligence, his ability to get along with others, and his perception that Mr. Skinner is not the type of person to re-offend.

Finally, attached as Exhibit F is a letter from the Superintendent of the Northern Neck Regional Jail, Ted Hull. Mr. Hull speaks of the more than three years that Mr. Skinner has served in his facility. He describes Mr. Skinner's institutional adjustment as "exemplary and his attitude and demeanor outstanding." Mr. Hull stated that "[i]n every aspect he has come to be a model inmate and an example to his peers." He goes on to say that "[i]n the truest sense, he is an example

of how the correctional system is supposed to work. I am supremely confident, that if given an opportunity, he will not disappoint."

### C. Discussion of Section 3553(a) Factors

In this case, Mr. Skinner's guidelines were increased by multiple levels due to the mechanical operation of the guidelines. This increase has little or nothing to do with Mr. Skinner's level of culpability, his likelihood of reoffending, or the seriousness of his offense conduct. Under the original Guidelines prepared by the probation officer, the high end of guidelines fell below the mandatory minimum sentence of 180 months.

Mr. Skinner is prepared to suffer the consequences of his actions. He has learned important lessons through this experience, his first with the criminal justice system. The Court can sentence Mr. Skinner with confidence that he is highly unlikely to engage in any criminal conduct in the future.

Since his arrest over three years ago, Mr. Skinner has become a model inmate and has worked to improve himself and those around him. Although he suffered significant physical injuries after being shot in the neck, and has struggled with serious mental health issues, he has improved himself in every area of his life. He has worked diligently in the kitchen at Northern Neck Regional Jail; he has availed himself of educational opportunities, including completing his GED with outstanding scores; he has improved his physical and mental health by engaging in regular and robust exercise routines, encouraging others to do the same; and he has become a friend and mentor to others in the jail.

Under all of the facts and circumstances of this case, a sentence of 180 months constitutes a very severe consequence for Mr. Skinner's actions, and a very significant and sufficient punishment, which is arguably greater than necessary to accomplish each objective set forth 18 U.S.C. § 3553(a). This sentence is more than consistent with the nature and circumstances of the

offense and the history and characteristics of Mr. Skinner, 18 U.S.C. § 3553(a)(1); it is more than appropriate with respect to the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with appropriate correctional treatment, as required under § 3553(a)(2), as described at length above; it is a just outcome in consideration of the kinds of sentences available, § 3553(a)(3); and it does not present the Court with any unwarranted disparities among defendants with similar records and conduct, § 3553(a)(6). Mr. Skinner will be deported to his home country, never to return to the United States.

Mr. Skinner is a man who will be severely punished for his conduct. In addition to the substantial prison time this Court is compelled to impose, he will be placed on the sex offender registry, not only in the United States while he serves his sentence, but also in his home country of New Zealand. And he suffered the consequences of being shot during his attempt to see R.D. His gunshot wound placed him in the hospital for a month, and he underwent multiple surgeries, leaving significant scars. PSR ¶ 81. He still experiences nerve damage from the gunshot wound around his ribs and in his fingers, and he has ongoing pain in his left shoulder and ribs, even after over three and a half years have passed since the shooting. He cannot straighten his fingers due to the nerve injuries. *Id.*

Nonetheless, Mr. Skinner has demonstrated great potential to change for the better. He has extensive support from friends. He has no history of criminal charges or convictions outside of this case. And he is learning to deal with the demons of his past and his mental health issues. He has much to give back to the community with both his compassion for others and his high level of intellect. A sentence of 180 months is more than half of the life he has already lived. It is more

than a sufficient amount of time in prison to accomplish each and every objective of 18 U.S.C. § 3553(a).

Mr. Skinner is 27 years old now. After serving his sentence and getting deported to New Zealand, he intends to volunteer to help incarcerated people upon his release, and to continue with his efforts to produce music. He has learned an important lesson about online relationships and has also learned that he needs to keep a close watch on his mental health status. Once he is released from prison, Mr. Skinner is determined not to place himself in this kind of situation ever again.

4. **Conclusion**

The sentencing factors in this case weigh heavily in favor of this Court varying significantly downward from the flawed sentencing recommendation of the guidelines; this Court should impose a sentence of 180 months. Mr. Skinner never intended to exploit a minor; he never intended any harm to R.D. or her family, but rather to himself. His pristine criminal history, his mental health concerns, and his substantial rehabilitation over the past three years all support a sentence at the low end of the statutory mandatory minimum sentencing range. Such a sentence fully complies with and accomplishes statutory sentencing purposes in a manner that compels Mr. Skinner to remember the consequences of his actions for the rest of his life.

Respectfully submitted,
**Troy Skinner**

By:       /s/
Robert J. Wagner, PLC
Va. Bar No. 27493
Counsel for Defendant
101 Shockoe Slip, Suite J
Richmond, VA 23219
(804) 814-8172
robwagnerlaw@gmail.com

                Laura Koenig
                Va. Bar No. 86840
                Counsel for Defendant
                Office of the Federal Public Defender
                701 E Broad Street, Suite 3600
                Richmond, VA 23219-1884
                Ph. (804) 565-0881
                Fax (804) 648-5033
                laura_koenig@fd.org